ROBBINS ARROYO LLP
BRIAN J. ROBBINS (190264)
FELIPE J. ARROYO (163803)
STEVEN R. WEDEKING (235759
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
        farroyo@robbinsarroyo.com
        swedeking@robbinsarroyo.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYNE BONNER, Derivatively on Behalf of AMYRIS, INC., | ) Case No. |
| Plaintiff, | ) VERIFIED STOCKHOLDER |
| v. | ) DERIVATIVE COMPLAINT FOR |
| JOHN MELO, KATHLEEN VALIASEK, GEOFFREY DUYK, JOHN DOERR, CAROLE PIWNICA, FERNANDO DE CASTRO REINACH, ABDULLAH BIN KHALIFA AL THANI, R. NEIL WILLIAMS, PATRICK YANG, ABRAHAM KLAEIJSEN, and CHRISTOPHE VUILLEZ, | ) BREACH OF FIDUCIARY DUTY |
| Defendants, | ) |
| -and- | ) |
| AMYRIS, INC., a Delaware corporation, | ) |
| Nominal Defendant. | ) DEMAND FOR JURY TRIAL |

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty.  Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge.  This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Amyris, Inc. ("Amyris" or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law.  These wrongs resulted in hundreds of millions of dollars in damages to Amyris's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed the Company to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.      Amyris is a traditionally integrated renewable products company providing sustainable alternatives to a broad range of products in the industrial, health and nutrition, and personal care areas.  Amyris claims to apply its bioscience solutions to convert plant sugars into hydrocarbon molecules and produce specialty ingredients in consumer products.

3.      At its inception, Amyris was focused on developing biofuels.  However, that industry soon became difficult for Amyris to compete in and the Company's revenues and stock price suffered as a result.  Thus, with the approval of the Amyris Board of Directors (the "Board"), and under Chief Executive Officer ("CEO") defendant John Melo's ("Melo") direction, in 2014, the Company shifted much of its focus to developing products for the health and nutrition market.  Specifically, the Board directed Amyris to concentrate its efforts on the production of alternative, sustainable, and noncaloric sweeteners.

4.      In pursuit of the Board's vision, Amyris looked to enter into partnerships with organizations that were involved in the flavor industry.  Accordingly, on December 30, 2016, Amyris entered into a license agreement with Phyto Tech Corp. (d/b/a Blue California).  Under the agreement, Blue California was granted a license to use certain of the Company's intellectual

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

property for various research and commercial purposes.  In exchange, Amyris was supposed to receive a $10 million cash payment.

5.     The Board, however, caused, or approved of an amendment to the agreement with Blue California.  The Individual Defendants (as defined herein) decided that the Company should instead take an equity stake in SweeGen, Inc. ("SweeGen"), a Blue California affiliate that produces sugar substitute sweeteners.  Thus, SweeGen became a vital part of the Company's strategic shift into making different flavors for use in the health and nutrition field.

6.     Unfortunately, the Individual Defendants never told the stockholders about their decision to retract a large cash payment due to the Company in favor of a minority equity stake in SweeGen.  Worse, they caused the Company to issue a press release which touted Amyris's financials and stated that the aggregate revenues for 2016 would include the $10 million cash payment from Blue California which the Individual Defendants had already renegotiated.

7.     On April 3, 2017, the Company suddenly announced that it could not timely file its Annual Report on Form 10-K for the fiscal year ended December 31, 2016.  Then, when Amyris did announce its yearly results on April 17, 2017, the Company stated that its 2016 revenue totaled $67.2 million, $10 million less than was previously reported.

8.     The following day, on April 18, 2017, the Company elaborated on how it reported a revenue figure to the public that was off-target by nearly 13%.  The Company revealed for the first time, that it was "unable to recognize $10 million in … revenue" because of the Individual Defendants' decision to take the equity stake in SweeGen rather than the guaranteed cash payment under the original license agreement.

9.     As a result of this disclosure, Amyris's stock plunged more than 20% in a two day trading loss, to close at $8.34 per share on April 19, 2017, erasing almost $614 million in market capitalization.

10.    Further, as a direct result of this unlawful course of conduct, the Company is now the subject of a federal securities class action filed in the U.S. District Court for the Northern District of California on behalf of investors who purchased Amyris's shares.

**JURISDICTION AND VENUE**

11.     Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interests and costs.

12.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Amyris maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Amyris, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**INTRADISTRICT ASSIGNMENT**

14.     A substantial portion of the transactions and wrongdoings which gave rise to the claims in this action occurred in the County of Alameda, and as such, this action is properly assigned to the San Francisco division of this Court.

**THE PARTIES**

**Plaintiff**

15.     Plaintiff Wayne Bonner was a stockholder of Amyris at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Amyris stockholder.  Plaintiff is a citizen of New York.

**Nominal Defendant**

16.     Nominal defendant Amyris is a Delaware corporation with principal executive offices located at 5885 Hollis Street, Suite 100, Emeryville, California.  Accordingly, Amyris is

1   a citizen of Delaware and California.  Amyris is an integrated industrial biotechnology company

2   that engineers, manufactures and sells products in the health and nutrition, personal care and

3   performance materials markets.  As of January 31, 2017, Amyris had 440 full-time employees.

4   **Defendants**

5         17.     Defendant Melo is Amyris's CEO and a director and has been since January 2007,

6   and President and has been since June 2008.  Defendant Melo is named as a defendant in a

7   related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the

8   Securities Exchange Act of 1934 (the "Exchange Act").  Defendant Melo knowingly, recklessly,

9   or with gross negligence made improper statements in the Company's press releases and public

10  filings concerning the Company's annual revenues.  Amyris paid defendant Melo the following

11  compensation as an executive:

12
13
14

| Year | Salary | Stock Awards | Option Awards | Change in Pension Value | All Other Compensation | Total |
|------|--------|--------------|---------------|-------------------------|------------------------|-------|
| 2016 | $550,000 | $250,750 | $162,350 | $333,056 | $468 | $1,296,624 |

15  Defendant Melo is a citizen of California.

16        18.     Defendant Kathleen Valiasek ("Valiasek") is Amyris's Chief Financial Officer

17  and has been since January 2017.  Defendant Valiasek is named as a defendant in a related

18  securities class action complaint that alleges she violated sections 10(b) and 20(a) of the

19  Exchange Act.  Defendant Valiasek knowingly, recklessly, or with gross negligence made

20  improper statements in the Company's press releases and public filings concerning the

21  Company's annual revenues.  Defendant Valiasek is a citizen of California.

22        19.     Defendant Geoffrey Duyk ("Duyk") is an Amyris director and has been since May

23  2012.  Defendant Duyk was also Amyris's Interim Chairman of the Board from May 2014 to at

24  least April 2017, and a director from May 2006 to May 2011.  Defendant Duyk is a member of

25  Amyris's Audit Committee and has been since at least April 2016.  Defendant Duyk knowingly

26  or recklessly made improper statements in the Company's press releases and public filings

27  concerning the Company's annual revenues.  Defendant Duyk is a citizen of Florida.

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1      20.     Defendant John Doerr ("Doerr") is an Amyris director and has been since May

2  2006. Defendant Doerr knowingly or recklessly made improper statements in the Company's

3  press releases and public filings concerning the Company's annual revenues. Defendant Doerr is

4  a citizen of California.

5      21.     Defendant Carole Piwnica ("Piwnica") is an Amyris director and has been since

6  September 2009. Defendant Piwnica knowingly or recklessly made improper statements in the

7  Company's press releases and public filings concerning the Company's annual revenues.

8  Defendant Piwnica is a citizen of England.

9      22.     Defendant Fernando de Castro Reinach ("Reinach") is an Amyris director and has

10  been since September 2008. Defendant Reinach is also a member of Amyris's Audit Committee

11  and has been since at least April 2016. Defendant Reinach knowingly or recklessly made

12  improper statements in the Company's press releases and public filings concerning the

13  Company's annual revenues. Defendant Reinach is a citizen of Brazil.

14      23.     Defendant Abdullah bin Khalifa Al Thani ("Al Thani") is an Amyris director and

15  has been since March 2012. Defendant Al Thani knowingly or recklessly made improper

16  statements in the Company's press releases and public filings concerning the Company's annual

17  revenues. Defendant Al Thani is a citizen of Qatar.

18      24.     Defendant R. Neil Williams ("Williams") is an Amyris director and has been

19  since May 2013. Defendant Williams is the Chairman of Amyris's Audit Committee and a

20  member of that committee and has been since at least April 2016. Defendant Williams

21  knowingly or recklessly made improper statements in the Company's press releases and public

22  filings concerning the Company's annual revenues. Defendant Williams is a citizen of

23  California.

24      25.     Defendant Patrick Yang ("Yang") is an Amyris director and has been since July

25  2014. Defendant Yang knowingly or recklessly made improper statements in the Company's

26  press releases and public filings concerning the Company's annual revenues. Defendant Yang is

27  a citizen of California.

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

26.     Defendant Abraham Klaeijsen ("Klaeijsen") is an Amyris director and has been since June 2015.  Defendant Klaeijsen knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's annual revenues. Defendant Klaeijsen is a citizen of England.

27.     Defendant Christophe Vuillez ("Vuillez") is an Amyris director and has been since November 2016.  Defendant Vuillez knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's annual revenues. Amyris paid defendant Vuillez the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Total |
| --- | --- | --- |
| 2016 | $6,413 | $6,413 |

Defendant Vuillez is a citizen France.

28.     The defendants identified in ¶¶17-18 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶17, 19-27 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶19, 22, 24 are referred to herein as the "Audit Committee Defendants."  Collectively, the defendants identified in ¶¶17-27 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

29.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Amyris and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Amyris in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Amyris and not in furtherance of their personal interest or benefit.

30.     To discharge their duties, the officers and directors of Amyris were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Amyris were required to, among other things:

(a)     accurately guide the Company's stockholders and the public when speaking about the Company's revenues and financial condition

(b)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(c)     remain informed as to how Amyris conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

31.     In addition, the Company has a "Code of Business Conduct and Ethics" (the "Code") that is "applicable to every employee, officer and director of the Company." The Company "expect[s] all of [its] directors, executives, managers and other supervisory personnel to help foster a sense of commitment to this Code among all [the] employees, and to foster a culture of fairness, honesty and accountability within the Company."  Further, each of the Individual Defendants have a "responsibility to read and understand this Code, and to use it as a guide to the performance of [their] responsibilities for the Company," and "[a]nyone who violates the standards in this Code will be subject to disciplinary action, which, in appropriate circumstances, may include termination of employment for cause, legal action or referral for criminal prosecution."

32.     The Code further requires that the Individual Defendants follow the Company's Legal Compliance Policy which states:

> You must always obey the law while performing your duties to the Company. You also must always comply with the Company's policies. Our success depends upon each employee, officer and director (a "Covered Person") operating within legal guidelines and cooperating with authorities. It is essential that you know and understand the legal and regulatory requirements that apply to our business and to your specific area of responsibility. While you are not expected to have complete mastery of these laws, rules and regulations, you are expected to be able to recognize situations that require you to consult with others to determine the appropriate course of action. If you have a question in the area of legal

compliance, you should approach your supervisor or the Compliance Officer immediately.

33.     The Code also requires that the Company's books, records, finances, and public disclosures be "fair" "accurate" and "[not] misleading." The Code's "Maintenance of Corporate Books, Records, Documents and Accounts; Financial Integrity; Public Reporting" states:

> We strive to maintain integrity of our records and public disclosure. Our corporate and business records, including all supporting entries to our books of account, must be completed honestly, accurately and understandably. Our records are important to investors and creditors. They serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees and others with whom we do ·business. We depend on our books, records and accounts accurately and fairly reflecting our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities.

> To help ensure the integrity of our records and public disclosure, we require that:

> - no entry be made in our books and records that is intentionally false or misleading;
> - transactions be supported by appropriate documentation;
> - the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in our books and records;
> - employees comply with our system of internal controls and be held accountable for their entries;
> - any off-balance sheet arrangements of the Company are clearly and appropriately disclosed;
> - no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund; and
> - records be retained or destroyed according to the Company's document retention policies or procedures then in effect.

> Our disclosure controls and procedures are designed to help ensure that the Company's reports and documents filed with or submitted to the SEC and other public disclosures are full, fair and accurate, that they fairly present our· financial condition and results of operations,· and that they are timely and understandable. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should adhere to all

disclosure controls and procedures and generally assist the Company in producing financial disclosures that contain all of the information about the Company that is required by law and would be important to enable investors to understand our business and its attendant risks. In particular:

- No employee may take or authorize any action that would cause the Company's financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

- All employees must cooperate fully with our finance department, as well as our independent public accountants and counsel, respond to their questions with. candor and provide them with complete and accurate information to help ensure that the Company's books and records, as well as its reports filed with the SEC, are accurate and complete; and

- No employee should knowingly make (or encourage any other person to make) any false or misleading statement in any of the Company's reports filed with the SEC or knowingly omit (or encourage any other person to omit) any information necessary to make the disclosure in any of such reports accurate in all material respects.

If you become aware that our public disclosures are not full, fair and accurate, or if you become aware of a transaction or development that you believe may require disclosure, you should report the matter immediately to your supervisor, or the Compliance Officer.

34.     The Code further proscribes special responsibilities to the CEO and "Senior Financial Officers" relating to ethical conduct and compliance.  The Code states:

While we expect honest and ethical conduct in all aspects of our business from all of our employees, special ethical obligations apply to our Chief Executive Officer and members of our Finance Department. They must adhere to the following principles and foster a culture throughout the Company as a whole that helps to ensure the fair and timely reporting of our financial results and condition:

- Act with honesty and integrity, maintain high standards of ethical conduct and use due care and diligence in performing their responsibilities to the Company, without allowing their independent judgment to be subordinated to personal interest.

- Avoid situations that represent actual or apparent conflicts of interest with their responsibilities to the Company, and disclose promptly to the General Counsel or Audit Committee any transaction or personal or professional relationship that reasonably could be expected to give rise to such an actual or apparent conflict.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- Provide information that is full, fair, accurate, timely and understandable for inclusion in the Company's financial statements to help ensure full, fair, accurate, timely and understandable disclosure in the reports and documents that the Company files with the Securities and Exchange Commission or otherwise discloses publicly in the Company's submissions to governmental agencies or in public statements.

- Comply and take all reasonable actions to cause others under their supervision to comply with applicable Laws, rules, and regulations of government authorities.

- Respect and safeguard the confidentiality of information acquired in the course of their work, except when authorized or legally obligated to disclose such information, and not use confidential information acquired in the course of work for personal advantage.

- Share knowledge with colleagues and maintain skills that are important and relevant to the performance of their duties.

- Proactively promote ethical behavior as a responsible partner among peers in the work environment.

- Achieve responsible use of and control over all entrusted assets and resources.

- Report known violations of this Code to the General Counsel or Audit Committee.

35.     Finally, the Code states that it is the "responsibility" of the Individual Defendants to "report ... a suspected or actual violation of Code standards by others."  The Code states:

*Clarifying Questions and Concerns; Reporting Possible Violations*

If you encounter a situation or are considering a course of action and its appropriateness is unclear, discuss the matter promptly with your supervisor or the Compliance Officer; even the appearance of impropriety can be very damaging to the Company and should be avoided. If you are aware of a suspected or actual violation of Code standards by others, you have a responsibility to report it. You should raise questions or report potential violations of this Code without any fear of retaliation in any form - it is our policy not to retaliate in such circumstances and we will take prompt disciplinary action, up to and including termination of employment for cause, against any employee who retaliates against you.

Supervisors must promptly report any complaints or observations of Code violations to the Compliance Officer. The Compliance Officer will investigate all reported possible Code violations promptly and with the highest degree of

confidentiality that is possible under the specific circumstances. As needed, the Compliance Officer will consult with the Legal Department, the Human Resources Department, the Nominating and Governance Committee and/or Audit Committee.

If the investigation indicates that a violation of this Code has probably occurred, we will take such action as we believe to be appropriate under the circumstances.

**Breaches of Duties**

36.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Amyris, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

37.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in making improper statements to the public and Amyris's stockholders and thus causing the Company to incur substantial damage.

38.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Amyris, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Amyris has expended, and will continue to expend, significant sums of money.

39.     The Individual Defendants also breached their own Code.  The Company's Code demands that "documents filed with or submitted to the SEC and other public disclosures are full, fair, and accurate," but the Individual Defendants violated this provision by allowing and disseminating misleading financial reports to the SEC and the public.

**Additional Duties of the Audit Committee Defendants**

40.     In addition to these duties, Under the Audit Committee Charter, the Audit Committee Defendants owe specific duties to Amyris to assist the Board in "oversight of the Company's accounting and system of internal controls." The Audit Committee Defendants also

are responsible for overseeing "the quality and integrity of the Company's financial reports." Moreover the Audit Committee's Charter states:

In order to fulfill its purpose, the Audit Committee is to:

- oversee Amyris's accounting and financial reporting processes and audits of Amyris's consolidated financial statements.

- oversee Amyris's relationship with its independent auditors ("Independent Auditors"), including appointing or changing Amyris's auditors and ensuring their independence.

- facilitate communication among the Independent Auditors and the Company's financial and senior management and the Board; and

- monitor the periodic reviews of the adequacy of the accounting and financial reporting processes and systems of internal control that are conducted by the Independent Auditors and the Company's financial and senior management;

\*   \*   \*

**III. Responsibilities and Duties**

\*   \*   \*

**Financial Statements and Disclosures**

*1. Review and discuss with management the Company's quarterly results and the related earnings press release prior to distribution to the public.*

*2. Review the Company's quarterly and annual financial statements, including any report on the Company's internal control over financial reporting, and any report or opinion by the Independent Auditors.*

3. In connection with the Committee's review of the annual financial statements:

- o   discuss the financial statements and the results of the Independent Auditors' audit of the financial statements with the Independent Auditors and management;

- o   discuss any items required to be communicated by the Independent Auditors in accordance with the applicable requirements of the Public Company Accounting Oversight Board. These discussions should include an overview of the planned scope and timing of the audit, the Independent Auditors' judgments about the quality and appropriateness of the Company's accounting principles, the reasonableness of significant judgments, the clarity of the disclosures in the Company's financial statements, and any significant difficulties encountered

during the course of the audit, including any restrictions on the scope of work or access to required information;

o   discuss with the Company's management and the Independent Auditors the Company's selection, application and disclosure of critical accounting policies and practices; and

4. Recommend to the Board whether the annual financial statements should be included in the Company's Annual Report on Form 10 K.

5. In connection with the Committee's review of the quarterly financial statements:

o   discuss with the Independent Auditors and the Company's management the results of the Independent Auditors' review of the quarterly financial statements;

o   discuss significant issues, events and transactions and any significant changes regarding accounting principles, practices, policies (internal or external), judgments or estimates with the Company's management and the Independent Auditors; and

o   resolve any disagreements between the Company's management and the Independent Auditors regarding financial reporting.

6. Discuss on a general basis the type of information to be disclosed and type of presentation to be made regarding financial information and earnings guidance to analysts and rating agencies.

**Internal Controls**

7. Periodically discuss with the Company's principal accounting officer the function of the Company's disclosure controls and procedures and any disclosure committee that may be established by the Company. Discuss with the Company's Chief Executive Officer and Chief Financial Officer their conclusions regarding the effectiveness of the Company's disclosure controls and procedures.

8. Review and discuss with the Independent Auditors and the Company's management their periodic reviews of the adequacy of the Company's accounting and financial reporting processes and systems of internal control, including any significant deficiencies and material weaknesses in their design or operation. In doing so, the Committee shall monitor and evaluate the Company's compliance with Section 404 of the Sarbanes-Oxley Act of 2002, including risk management required thereby.

***9. Review any fraud involving management or any employee of the Company with a significant role in the Company's internal controls over financial reporting that are disclosed to the Committee.***

\*   \*   \*

*13. Review with management the Company's major financial risk exposures and the steps management has taken to monitor such exposures, including the Company's procedures and any related policies, with respect to risk assessment and risk management.*

\*   \*   \*

**General**

*20. On a regular basis, review the status of any legal and regulatory matters that could have a significant impact on the Company's financial statements.*

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

41.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

42.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Amyris, regarding the Individual Defendants' management of Amyris's operations and the Company's annual revenues; and (ii) enhance the Individual Defendants' executive and directorial positions at Amyris and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

43.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

44.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law and breaches of fiduciary duty; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

45.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

46.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## THE COMPANY SHIFTS ITS BUSINESS TO THE
## HEALTH AND NUTRITION MARKET

47.     Amyris is in the business of bioengineering.  The Company engineers organisms and attempts to make various products through an environmentally sustainable approach.  Amyris originally focused its business on the development of biofuels.  However, the Company has shifted much of its focus to developing products for the health and nutrition market.  Specifically, the Board directed Amyris to concentrate its efforts on the production of alternative, sustainable, and noncaloric sweeteners.

48.     In pursuit of this vision, Amyris entered into a license agreement with Blue California on December 30, 2016.  Pursuant to the agreement, the Company granted Blue California a royalty-free, nonexclusive, worldwide, license to access and use certain Company intellectual property for the purpose of research and development, scale-up, manufacturing and commercialization activities. In exchange for such license, Blue California agreed to pay the Company a fee of $10 million in cash.

49.     However, in the first quarter of 2017, the Individual Defendants forced the Company to amend the terms of the license agreement.  Under the amended agreement, Amyris would take a minority equity stake in SweeGen (a Blue California affiliate) by accepting 850,115

1    shares of SweeGen stock in lieu of the cash payment.

2        50.    Unfortunately, the public was not informed that Amyris chose to take an equity

3    stake in SweeGen rather than taking a $10 million cash payment.  Even worse, as explained in

4    more detail below, Amyris's fiduciaries touted the Company's revenue growth to the public as if

5    it was due to make millions from its agreement with Blue California.

6                                    **IMPROPER STATEMENTS**

7        51.    The improper statements began on March 2, 2017, when the Company issued a

8    press release, titled "Amyris More Than Doubles Revenues over 2015 And Provides Strong

9    Growth Outlook."  The press release announced revenues of $77.2 million for fiscal year 2016.

10   However, as the public would soon learn, the revenues for the year were actually much lower.

11   The press release stated:

> **Amyris More Than Doubles Revenues Over 2015 And Provides Strong Growth Outlook**
>
> - *Record 2016 revenues\* of $77.2 million, up 126% over $34.2 million for 2015*
>
> - *Record Q4 2016 revenues\* of $32.2 million, a 227% increase over $9.8 million for Q4 2015*
>
> - *Q4 and full year 2016 selling, general and administrative expenses decreased 5% and 15%, respectively*
>
> - *October 2016 MOU with Leading Global Food Ingredients and Nutraceuticals Partner leads to $10 million in Q4 revenues*
>
> EMERYVILLE, Calif., March 02, 2017 (GLOBE NEWSWIRE) -- Amyris, Inc. (Nasdaq:AMRS), the industrial bioscience company, today announced financial results for the fourth quarter and fiscal year ended December 31, 2016.
>
> "We are pleased to have completed a record year by more than doubling revenues over 2015, signing on a record level of new global partners and delivering on all of our 2016 strategic milestones," said John Melo, Amyris President & CEO. "With the completion of our portfolio shift to Health and Nutrition and Personal Care and away from Fuel sales we believe we are delivering industry leading growth and positive impact for our customers."
>
> Continued Melo, "We enter 2017 as a leading company in our sector with the most robust technology platform available to develop, scale and produce the products our customers need to help them gain competitive advantage while

supporting the health needs of our planet. We are industrializing synthetic biology and delivering highly disruptive technology through our advantaged collaboration and value share business model."

* * *

**_Financial Performance_**

* * *

_Fiscal Year 2016_

- Revenues for fiscal year 2016 were $77.2 million, compared with $34.2 million for 2015. The increase was driven by significant growth in both product sales and collaboration revenues. Product sales increased 77% led primarily by increases in personal care and health and nutrition segments. Collaboration revenues were at a record* level at $50.8 million, up from $19.3 million for 2015. This was driven by collaborations with Ginkgo Bioworks, DARPA, Givaudan, as well as an unnamed partner for which an MOU was announced on October 13, 2016.

- For 2016, selling, general and administrative expenses were $47.7 million, down 15% from 2015. Research and development expenses of $51.4 million for 2016 were up from $44.6 million for 2015 due to a significant increase in collaboration activity.

- Net loss attributable to Amyris common stockholders for fiscal year 2016 was $87.3 million, or $0.37 per basic and $0.40 per diluted share. Included in the 2016 net loss were several large non-cash items, totaling $22.2 million, which included a loss from debt extinguishment and gains from changes in fair value of derivatives offset by asset impairments and stock based compensation. Adjusted net loss**, excluding these non-cash items, was $109.5 million, or $0.46 per basic share. This compared to a fiscal year 2015 net loss of $218.0 million, or $1.75 per basic and diluted share and an adjusted net gross for 2015 of $135.7 million, or $1.10 per basic share.

- Cash, cash equivalents, short-term investments, and restricted cash at December 31, 2016 was $33.8 million, compared with $14.7 million at December 31, 2015.

52.    That same day, on an earnings conference call with analysts and investors, defendant Melo reiterated the misleading 2016 revenue figures, stating:

Let's start with our results. **_We completed a record year by more than doubling our revenues over 2015_**. Having signed a record number of new global partners and delivered on the 2016 strategic milestones we communicated to you. As a

result, and excluding historical periods when we engaged in ethanol sales and trading, we posted record revenues in both collaborations and product sales.

In fact, our revenues of $33.2 million marked our second consecutive quarter of achieving record revenues. *Which also helped underpin record revenues of $77.2 million for 2016 overall.*

53.     On April 3, 2017, the Individual Defendants again caused the Company to issue a misleading statement about Amyris's 2016 revenues.  The Company filed with the SEC a Notification of Late Filing on Form NT 10-K, signed by defendant Valiasek.  The Form NT 10-K announced that the Company expected to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2016 "on or before the fifteenth calendar day following the Form 10-K's due date." Despite being unable to timely file the Form 10-K, the Form NT 10-K still claimed that the "*Company's aggregate revenues for the year ended December 31, 2016 were $77.2 million versus $34.2 million in the prior year.*"

## THE TRUTH EMERGES

54.     On April 17, 2017, the Company filed its 2016 Annual Report on Form 10-K, signed by defendants Melo, Valiasek, Duyk, Doerr, Piwnica, Reinach, Al Thani, Williams, Yang, Klaeijsen, and Vuillez with the SEC.  The Company disclosed for the first time that its revenues were not $77.2 million for fiscal year 2016, but rather $67.2 million.  The Form 10-K barely addressed the large revenue discrepancy, devoting only one sentence to it.  In fact, the Individual Defendants attempted to put a positive spin on the reduced earnings, stating: "Our total revenues increased by $33.0 million to $67.2 million in 2016 as compared to the prior year, *primarily due to significant growth in product sales and grants, collaborations, and license fee revenues*."

55.     The following day, the Company filed a Current Report on Form 8-K with the SEC, and explained for the first time how it miscalculated its revenues by nearly 13%.  The Company explained that it revised its revenues because it took an equity stake in SweeGen rather than the cash payment under the original license agreement with Blue California.  Further, the disclosure revealed that the Board made this decision in the first quarter of 2017.  The Form 8-K stated:

**Item 7.01 Regulation FD Disclosure.**

On March 2, 2017, Amyris, Inc. (the *"Company"*) issued a press release (the *"Earnings Release"*) announcing the Company's financial results for its fiscal quarter and year ended December 31, 2016. In the Earnings Release, the Company disclosed, among other things, revenues for fiscal 2016 of $77.2 million and collaboration revenues of $50.8 million, driven in part by a license agreement with Phyto Tech Corp. (D/B/A *"Blue California"*) dated as of December 30, 2016, which agreement was part of a Memorandum of Understanding announced on October 13, 2016, and with respect to which $10 million of revenue was initially recorded in the fourth quarter and full year 2016. Subsequently, on April 3, 2017, the Company filed a Notification of inability to timely file -Form 10-K on Form 12b-25 (the *"Form 12b-25"*) with the Securities and Exchange Commission (the *"SEC"*), in which the Company reiterated certain of the financial results disclosed in the Earnings Release.

On April 17, 2017, the Company filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2016 (the *"Form 10-K"*) with the SEC. In the Form 10-K, the Company disclosed revenues for fiscal year 2016 of $67.2 million, representing a decrease of $10 million from the revenue figures disclosed in the Earnings Release and Form 12b-25. The decrease was due to the Company's determination that it was unable to recognize $10 million in fourth quarter and fiscal year 2016 revenue relating to the license agreement with Blue California. ***This was due to the decision by the Company in the first quarter of 2017*** to accelerate its market access and strategic positioning for the sweetener market, which Blue California has interests in, and take an equity stake in one of Blue California's affiliates, focused on the sweetener market, in lieu of cash payment under the license agreement. Due to the change in the payment structure, the accounting treatment is different and therefore the revenue recognition has been delayed and is expected in the first half of 2017. The Company has delivered technology consistent with the terms of the license agreement and has been working to the satisfaction of Blue California. The decision to contribute the license payment to an equity investment is aligned with the strategic direction of the Company to become one of the leading technology providers for the sweetener market and replace sugar as a sweetener with healthy, low calorie sweeteners that support the strategy of major brands globally. Investors are strongly encouraged to review the sections of the Form 10-K entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Financial Statements and Supplementary Data" for additional details regarding the Company's financial results for the fiscal year ended December 31, 2016.

56.     Following the news of the $10 million negative revision in earnings, Amyris's market capitalization plunged more than 20% over two trading days, to close at $8.34 per share on April 19, 2017, erasing almost $614 million in market capitalization.

1

**REASONS THE STATEMENTS WERE IMPROPER**

2          57.      The statements referenced above were each improper when made because they

3    failed to disclose and misrepresented the following material, adverse facts, which the Individual

4    Defendants knew, consciously disregarded, or were reckless in not knowing:

5                      (a)      that the Company took an equity stake in SweeGen, the Blue California

6    affiliate, instead of a cash payment under the license agreement;

7                      (b)      that Amyris would be unable to recognize $10 million in revenue from the

8    license agreement; and

9                      (c)      as a result of the foregoing, the representations concerning the Company's

10   2016 revenue were improper and misleading.

11

**DAMAGES TO AMYRIS**

12         58.      As a result of the Individual Defendants' improprieties, Amyris disseminated

13   improper, public statements concerning its revenues.  These improper statements have devastated

14   Amyris's credibility as reflected by the Company's more than $600 million, or 20%, market

15   capitalization loss.

16         59.      Amyris's performance issues also damaged its reputation within the business

17   community and in the capital markets.  In addition to price, Amyris's current and potential

18   customers consider a company's ability to accurately value its business prospects and evaluate its

19   annual revenues.  Amyris's ability to raise equity capital or debt on favorable terms in the future

20   is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and

21   debt because the improper statements and misleading projections disseminated by the Individual

22   Defendants have materially increased the perceived risks of investing in and lending money to

23   the Company.

24         60.      Further, as a direct and proximate result of the Individual Defendants' actions,

25   Amyris has expended, and will continue to expend, significant sums of money.  Such

26   expenditures include, but are not limited to:

27                      (a)      costs incurred from defending and paying any settlement in the class

28   actions for violations of federal securities laws; and

1          (b)      costs incurred from compensation and benefits paid to the defendants who

2    have breached their duties to Amyris.

3                  **<u>DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS</u>**

4          61.      Plaintiff brings this action derivatively in the right and for the benefit of Amyris

5    to redress injuries suffered, and to be suffered, by Amyris as a direct result of breaches of

6    fiduciary duty, as well as the aiding and abetting thereof, by the Individual Defendants.  Amyris

7    is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to

8    confer jurisdiction on this Court that it would not otherwise have.

9          62.      Plaintiff will adequately and fairly represent the interests of Amyris in enforcing

10   and prosecuting its rights.

11         63.      Plaintiff was a stockholder of Amyris at the time of the wrongdoing complained

12   of, has continuously been a stockholder since that time, and is a current Amyris stockholder.

13         64.      The current Board of Amyris consists of the following eleven individuals:

14   defendants Melo, Duyk, Doerr, Piwnica, Reinach, Al Thani, Williams, Yang, Klaeijsen, and

15   Vuillez, and non-defendant Philip Eykerman.  Plaintiff has not made any demand on the present

16   Board to institute this action because such a demand would be a futile, wasteful, and useless act,

17   as set forth below.

18   **Demand Is Excused Because Defendants Face a Substantial Likelihood of Liability for**
     **Their Misconduct**
19

20         65.      Defendants Melo, Duyk, Doerr, Piwnica, Reinach, Al Thani, Williams, Yang,

21   Klaeijsen, and Vuillez breached their fiduciary duties of loyalty by allowing Amyris to reject the

22   cash payment due under the license agreement while reporting revenues that included the cash

23   payment.  The decision to acquire an equity stake in SweeGen (rather than accept the $10 million

24   cash payment from Blue California) was a major event for the Company and thus would have

25   required Board approval.  Despite this fact, the Company reported in the Form NT 10-K, on

26   April 3, 2017, that revenues for 2016 were $77.2 million.  The Board would have to approve of

27   the reasons and messaging for being unable to file the Form 10-K.  Hence, the Board would have

28   had knowledge and control over the contents of the Form NT 10-K and approved its filing with

1    misleading information.

2         66.    Similarly, the transaction with Blue California was a major deal for the Company

3    that required Board approval.  The Board would also be responsible for the messaging of this

4    significant transaction to stockholders and the public.  Accordingly, defendants Melo, Duyk,

5    Doerr, Piwnica, Reinach, Al Thani, Williams, Yang, Klaeijsen, and Vuillez are responsible and

6    face a substantial likelihood of liability for the March 2, 2017 improper statement.

7         67.    Defendants Duyk, Reinach, and Williams as members of the Audit Committee,

8    reviewed and approved the improper statements and earnings guidance.  The Audit Committee's

9    Charter provides that it is responsible for the "oversight of the Company's accounting and system

10   of internal controls."  Further, the Audit Committee Defendants are responsible for overseeing

11   "the quality and integrity of the Company's financial reports."  Finally the Audit Committee is

12   tasked with "[r]eviewing with management the Company's major financial risk exposures."

13   Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing

14   the improper statements related to the Company's earnings guidance and financial and disclosure

15   controls.  Further, the Audit Committee Defendants reviewed and approved the April 3, 2017

16   Form NT 10-K which contained a material misstatement regarding Amyris's revenues.

17   Moreover, the Audit Committee Defendants reviewed and approved the improper press releases

18   made to the public.  Despite their knowledge or reckless disregard, the Audit Committee

19   Defendants caused these improper statements.  Accordingly, the Audit Committee Defendants

20   breached their fiduciary duty of loyalty and good faith because they participated in the

21   wrongdoing described herein.  Thus, the Audit Committee Defendants face a substantial

22   likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

23   **Demand Is Excused Because Several Directors Cannot Conduct an Independent**
24   **Investigation of the Wrongful Conduct.**

25         68.    As admitted in the Company's Proxy Statement on Schedule 14A filed with the

26   SEC on April 27, 2017, defendants Melo, Vuillez, and Yang are not independent.  In particular,

27   the Proxy Statement explains that "the Board has determined that (i) [defendant] Melo is not

28   independent because he is an Amyris employee, (ii) [defendant] Vuillez is not independent

1  because he is an employee with [Total Energies Nouvelles Activités USA ("Total")] (with which

2  we have a joint venture arrangement and commercial and other relationships, as described below

3  under the Section titled "Transactions with Related Persons"), and (iii) [defendant] Yang is not

4  independent because, prior to serving on the Board, [defendant] Yang worked as a consultant to

5  the company from September 2013 through June 2014 and received compensation in excess of

6  $120,000 during such period for his services."

7      69.    Defendant Vuillez is not independent, by the Company's own admission, because

8  he is an employee of Total and Total is involved in a joint venture agreement and other

9  transactions with the Company.  In fact, defendant Vuillez is not a mere employee but an

10 executive of Total and was designated by it to represent its interests and serve on Amyris's

11 Board.  Defendant Vuillez is also a committee member of Total's venture capital activities.

12 Companies that are involved in venture capital activities like Total will not sue CEOs of the

13 companies that they are invested in because of the fierce competition in the industry to find

14 suitable investments.  Venture Capitalists are aware that their investment opportunities would

15 become even scarcer if CEOs believed that they could be sued by them.  Thus defendant Vuillez

16 will not initiate litigation against defendant Melo because he controls Amyris and Total would be

17 at risk of losing future investment opportunities with the Company if such a suit occurred.

18     70.    Defendant Vuillez also cannot impartially consider a demand to sue defendant

19 Melo because Total has already benefited from several advantageous transactions with Amyris.

20 For instance, in January 2015, Amyris's stock was trading at over $25 per share.  However Total

21 was able to purchase a senior secured convertible note which had a March 1, 2017 maturity date

22 and a conversion price of only $4.11 per share of Amyris's common stock.  Moreover, in July

23 2015, Total (along with Naxyris S.A. ("Naxyris") and Foris Ventures, LLC ("Foris")) entered

24 into a Securities Purchase Agreement with Amyris and the three entities purchased 16,025,642

25 shares of the Company's common stock for only $1.56 per share.  In addition, Amyris granted a

26 warrant to Total to purchase Amyris stock at $0.01 per share (for shares of common stock equal

27 to 10% of the shares that Total purchased).  These transactions were very lucrative for Total

28 because Amyris's stock was trading for over $23 per share at the time.

71.     Defendant Doerr is not an independent director because he would also risk the continued financial support by Amyris if he initiated litigation against defendant Melo or other Board members.  Defendant Doerr is a partner of a venture capital firm, Kleiner Perkins Caufield & Byers and indirectly owns all the membership interest in Foris.  As mentioned above, venture capitalists such as defendant Doerr will not sue CEOs of the companies that they are invested in given the fierce competition in the industry to find investments.

72.     Another reason defendant Doerr will not sue defendant Melo is because his two investment vehicles have, with defendant Melo's blessing and approval, benefited from numerous financial transactions with Amyris.  For instance, last year, defendant Doerr brought Renmatrix (a company that defendant Doerr is invested in and defendant Melo is a director of) into a three year multi-million dollar joint-venture deal with Amyris and the U.S. Department of Energy.  Further, defendant Doerr's other company, Foris, has been the recipient of several financially beneficial transactions with Amyris.  In July 2015, Foris (along with Naxyris and Total) entered into a Securities Purchase Agreement with Amyris, purchasing the Company's common stock for only $1.56 per share. As part of that deal, defendant Doerr also received a warrant to purchase shares at only $0.01 per share (for shares of common stock equal to 10% of the shares that he purchased).  These transactions were very lucrative for defendant Doerr because Amyris's stock was trading for over $23 per share at the time.  Further, in February 2016, Amyris entered into another Note and Warrant Purchase Agreement with Foris.  Under this sweetheart deal, Foris purchased a promissory note for $18 million from the Company, at a high rate of 13.5% per annum, and received warrants to purchase 2,285,714 common shares of Amyris stock at only $0.01 per share.  This agreement was a generous reward to Doerr as the Company's stock was trading over $20 per share at the time.  In addition, the 13.5% interest rate was several points higher than the rate on promissory notes that Amyris sold to other companies. For instance, that same year, Amyris sold promissory notes with only 5% interest rates to Nikko Chemicals Co., Ltd., and Salisbury Partners, LLC.  Additionally, Guanfu Holding Co., Ltd. purchased a promissory note in 2016 with a 10% rate.  Thus, Doerr received much more favorable terms than entities that did not have direct connections to the Board.  Moreover, in

- 24 -

1  June 2016 and October 2016, Foris entered into two more Note Purchase Agreements with the

2  Company whereby Foris purchased from Amyris a $5 million and $6 million promissory note,

3  respectively, at the charitable rate of 13.5% per annum.  In sum, defendant Doerr has benefited

4  greatly through his side transactions with Amyris, the access to which defendant Melo controls,

5  and he would not want to risk future deals by initiating litigation against defendant Melo.

6        73.    Defendant Piwnica is another director who has a financial interest in not pursuing

7  litigation against defendant Melo and other Board members.  Like defendant Doerr, defendant

8  Piwnica has a financially beneficial relationship with defendant Melo that she is unlikely to

9  jeopardize because it would cause financial harm to her company.  Defendant Piwnica is a

10  director of NAXOS UK, and she has been designated by that company to serve as its

11  representative on Amyris's Board.  Throughout the years, Naxyris (a subsidiary of NAXOS UK)

12  has used defendant Piwnica to attain financially advantageous deals from Amyris.  As mentioned

13  above, in July 2015, Naxyris entered into the Securities Purchase Agreement with Foris and

14  Total to buy certain of Amyris's shares.  Under that agreement, Naxryis was able to receive

15  stocks at a heavily discounted rate of $1.56 per share and $0.01 per share for certain stocks even

16  though the Company's common stock was trading at above $23 per share.  Naxyris also took part

17  in the February 2016 Note and Warrant Purchase Agreement with Amyris.  Naxyris, like Doerr,

18  benefitted from that sweetheart deal as it purchased a $2 million promissory note with a high

19  13.5% interest rate, while receiving warrants to purchase 285,714 shares of Ayris common stock

20  for only $0.01 per share.  As mentioned above, the 13.5% was considerably higher than the rate

21  given to other purchasers of Amyris's promissory notes. Further 13.5% is a higher rate than

22  Amyris's industry peers gave when they sold notes around the same time.  In 2014 for example,

23  Landec Corporation sold a $7 million promissory note which only had a 3.68% interest rate and

24  in 2013, Intrexon sold a $1.96 million promissory note with a 3% interest rate.  Thus, under

25  Melo's tenure, Naxyris has derived substantial benefits through its deals with Amyris.  As a

26  result, Naxyris cannot impartially consider initiating litigation against Melo.

27        74.    Finally, defendant Al Thani lacks independence because he also has a significant

28  financial interest in keeping defendant Melo on the Board.  Like defendant Doerr, defendant Al

1   Thani owns an investment fund that receives favorable deals from Amyris.  Defendant Al Thani's

2   fund, Biolding Investment SA ("Biolding"), entered into Amyris's February 2016 Note and

3   Warranty deal with Foris and Naxyris.  Like defendants Doerr and Piwinica, defendant Al Thani

4   was handsomely rewarded in this deal.  Biolding purchased a $2 million promissory note at a

5   considerably high 13.5% rate and received warrants to purchase 285,714 shares of Ayris

6   common stock for the heavily discounted price of only $0.01 per share.  Hence there is reason to

7   doubt whether defendant Al Thani can impartially consider a demand to sue defendant Melo

8   because such litigation would result in financial harm for defendant Al Thani (since defendant

9   Melo would prohibit him from entering into financially lucrative deals with Amyris in the

10  future).

11       75.    Plaintiff has not made any demand on the other stockholders of Amyris to

12  institute this action since such demand would  be a futile and useless act for at least the following

13  reasons:

14            (a)     Amyris is a publicly held company with over 297 million shares

15  outstanding and thousands of stockholders;

16            (b)     making demand on such a number of stockholders would be impossible

17  for plaintiff who has no way of finding out the names, addresses, or phone numbers of

18  stockholders; and

19            (c)     making demand on all stockholders would force plaintiff to incur

20  excessive expenses, assuming all stockholders could be individually identified.

21                                    **COUNT**

22           **Against the Individual Defendants for Breach of Fiduciary Duty**

23       76.    Plaintiff incorporates by reference and realleges each and every allegation

24  contained above, as though fully set forth herein.

25       77.    The Individual Defendants owed and owe Amyris fiduciary obligations.  By

26  reason of their fiduciary relationships, the Individual Defendants owed and owe Amyris the

27  highest obligation of good faith, fair dealing, loyalty, and due care.

28

78.    The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Amyris, and/or consciously failing to prevent to Company from engaging in the unlawful acts complained of herein.

79.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Amyris has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

80.    Plaintiff, on behalf of Amyris, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Amyris, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties;

B.    Directing Amyris to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Amyris and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following Corporate Governance Policies:

1.    a proposal to strengthen the Company's controls over financial reporting;

2.    a proposal to strengthen Amyris's oversight of its disclosure procedures;

3.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

4.    a provision to permit the stockholders of Amyris to nominate at least three candidates for election to the Board;

C.    Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a

1  constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or

2  their other assets so as to assure that plaintiff on behalf of Amyris has an effective remedy;

3       D.    Awarding to Amyris restitution from defendants, and each of them, and ordering

4  disgorgement of all profits, benefits, and other compensation obtained by the defendants;

5       E.    Awarding to plaintiff the costs and disbursements of the action, including

6  reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

7       F.    Granting such other and further relief as the Court deems just and proper.

8  **JURY DEMAND**

9      Plaintiff demands a trial by jury.

10 Dated: August 15, 2017             ROBBINS ARROYO LLP

11                               BRIAN J. ROBBINS
                              FELIPE J. ARROYO

12                               STEVEN R. WEDEKING

13                               /s/*Brian J. Robbins*

14                             BRIAN J. ROBBINS

15                           600 B Street, Suite 1900
                        San Diego, CA 92101

16                         Telephone: (619) 525-3990
                        Facsimile: (619) 525-3991

17                         E-mail: brobbins@robbinsarroyo.com
                              farroyo@robbinsarroyo.com

18                               swedeking@robbinsarroyo.com

19                         Attorneys for Plaintiff

20

21

22

23

24

25

26

27  1196424

28

- 28 -
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, Wayne Bonner, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 08/11/2017

WAYNE BONNER