UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WAYNE BONNER, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>JOHN MELO, et al.,<br><br>    Defendants. | Case No. 17-cv-04719-WHO<br><br>**ORDER GRANTING MOTION TO DISMISS WITH PREJUDICE**<br><br>Re: Dkt. No. 37 |

In my prior Order dismissing this shareholders derivative class action, I explained that plaintiff's complaint suffered from significant omissions. First, plaintiff did not support his misstatement or failure to correct breach of fiduciary duty claim with facts showing that the directors knowingly disseminated false information or dishonestly failed to correct a prior misrepresentation. March 9, 2018 Order at 5.[1] Second, plaintiff did not support his claim of demand futility with facts showing that any director acted in self-interest or was necessarily beholden to the control of an interested director to excuse demand. *Id*. at 6-7. I gave plaintiff leave to amend.

In amending, plaintiff changed his theories of liability and demand futility. According to the plaintiff, the wrong committed by defendants alleged in the Amended Complaint (AC) is: "Defendants continuing to tell the shareholders and the public that the deal would result in $10 million in revenue to the Company despite the fact the value of the stock received was between $212,528.75 and $3.2 million and whether Defendants adequately informed itself when

---

[1] The individual defendants are John Melo (Amyris's CEO); Kathleen Valiasek (Amyris's CFO); Geoffrey Duyk (an Amyris director); John Doerr (an Amyris director); Carole Piwnica (an Amyris director); Fernando de Castro Reinach (an Amyris director); Abdullah bin Khalifa Al Thani (an Amyris director); R. Neil Williams (an Amyris director); Patrick Yang (an Amyris director); Abraham Klaeijsen (an Amyris director); and Christophe Vuillez (an Amyris director).

renegotiating the deal." Oppo. at 3. These new theories of liability run up against the business judgment rule, which cannot avoided based on plaintiff's own facts. Plaintiff continues to fail to plead facts showing *knowing* falsity with respect to any of the alleged misrepresentations made by the defendants. And demand futility has not been shown: the AC contains no facts suggesting a significant risk of personal liability to the defendants, evidence of bad faith, or that the decision falls outside the protection of the business judgment rule.

In light of these continuing deficiencies, the Amended Complaint is dismissed. Given the multiple opportunities plaintiff has had to plead his case, it is dismissed with prejudice.

**BACKGROUND**

The background of the transaction and disclosures at issue was laid out in the March Order, but is repeated here. On December 30, 2016, Amyris entered into a license agreement with Phyto Tech Corp. (d/b/a Blue California). AC ¶ 4. Under the agreement, Blue California was granted a license to use certain of Amyris's intellectual property for various research and commercial purposes. In exchange, Amyris was to receive a $10 million cash payment. *Id*.

The Board, however, caused, or approved of an amendment to the agreement with Blue California. The defendants decided that Amyris should instead take an equity stake in SweeGen, Inc. ("SweeGen"), a Blue California affiliate that produces sugar substitute sweeteners. *Id*. ¶ 5. Plaintiff alleges that the defendants did not "timely" tell the stockholders about their decision to retract the large cash payment due to Amyris in favor of a minority equity stake in SweeGen or the financial impacts of taking the equity. *Id*. ¶ 6. To the contrary, on March 2, 2017, they caused Amyris to issue a press release which touted Amyris's financials and stated that the aggregate revenues for 2016 would include the $10 million cash payment from Blue California which the Individual Defendants had already renegotiated to be an equity deal. *Id*. ¶¶ 6, 52. That press release, titled "Amyris More Than Doubles Revenues over 2015 And Provides Strong Growth Outlook," announced revenues of $77.2 million for fiscal year 2016. *Id*. ¶ 52. That same day, in an earnings call, defendant Melo reiterated the 2016 revenue figures. *Id*. ¶ 53. On April 3, 2017, the Company announced that it could not timely file its Annual Report on Form 10-K for the fiscal year ended December 31, 2016, but again still claimed that the aggregate revenues for year ending

December 31, 2016 were $77.2 million. *Id*. ¶ 54.

When Amyris announced its yearly results on April 17, 2017, the Company stated that its 2016 revenue totaled $67.2 million, $10 million less than was previously reported. *Id*. ¶¶ 7, 55. On April 18, 2017, Amyris elaborated on its revised, reported revenue figures and revealed for the first time, that it was "unable to recognize $10 million in … revenue" because of the defendants' decision to take the equity stake in SweeGen rather than the guaranteed cash payment under the original license agreement. *Id*. ¶¶ 8-9, 56. As a result of this disclosure, Amyris's stock decreased more than 20% in a two day trading loss to close at $8.34 per share on April 19, 2017, erasing almost $614 million in market capitalization. *Id*. ¶¶ 9, 57.

In addition, as added in the AC, plaintiff complains that neither the April 17, 2017 10-K nor the April 18, 2017 disclosures explained to the public that the change from cash to stock would significantly lower the amount of revenue to be recognized. *Id*. ¶ 9. According to plaintiff, based on the then-market price, the value of the stock was only $300,000, while an independent valuation secured by Amyris valued the stock at $3.2 million, both of which are significantly less than the $10 million that Amyris had previously told the public. *Id*. Ultimately, the Q2 2017 results disclosed that Amyris recognized only $2.7 million from the deal with Blue California, instead of the $10 million figure defendants initially disclosed. *Id*. ¶ 10.

On April 20, 2017, a class action complaint was filed against Amyris related to the stock drop. This derivative action and a second substantially identical action were filed on August 15, 2017 and August 24, 2017. The three cases were related, the two derivative actions consolidated, and plaintiff Bonner appointed as lead plaintiff for the derivative action on September 19, 2017. Dkt. No. 14. The original class action complaint was subsequently dismissed on September 21, 2017. The only cause of action asserted in the derivative action is a breach of fiduciary duty claim.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its

3

face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id*. While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir.1989).

**DISCUSSION**

**I.     BREACH OF A FIDUCIARY DUTY**

As noted above, in his Amended Complaint plaintiff changed the focus of defendants' alleged wrongdoing. In the prior Complaint and motion to dismiss, he contended that defendants breached their fiduciary duty for failing to disclose the switch in form of revenue from the deal and the delayed accounting of the revenue from the deal. Plaintiff now alleges that defendants breached their fiduciary duty by continuing to disclose and failing to correct the inflated revenue amount (the initial $10 million value of the deal) and for misstatements made regarding the value of the equity deal.

4

### A. Improper Statements

In his AC, plaintiff identifies the following "improper statements." In the April 3, 2017, NT 10-K, the company announced its delay in filing its 10-K for 2016. AC ¶ 54. Despite having made the decision to take equity instead of cash, Amyris still claimed it would recognize revenues of $10 million from the Blue California deal. *Id*. On April 17, 2017, Amyris's 10-K disclosed for the first time that 2016 revenues would be $10 million less than previously indicated, without focusing on the fact that revenue predictions it made days prior deceased by $10 million or explaining the decrease. *Id*. ¶ 55. The Form 10-K failed to disclose that the revenue decrease was due to the decision to take equity and not cash in the Blue California deal, what the number of shares secured was (although the shares were transferred to Amyris that very day), and that the actual "market price" value of the equity was (according to plaintiff's calculation) only $300,000. *Id*. ¶¶ 55, 59. On April 18, 2017, Amyris filed a Current Report Form 8-K where it for the first time explained that the revised revenue figures were the result of taking the equity stake rather than the cash payment. *Id*. ¶ 56. However, the 8-K did not disclose that the value of the deal would be significantly less than the $10 million previously expected, and instead gave the impression that the Company would still recognize $10 million from the deal. *Id*. ¶ 58. Plaintiff asserts that the "context and timing" of the 8-K makes it clear that the company was unable to file its 10-K on time and had to use the NT-10-K because of the change in the deal payment to equity. *Id*.

### B. Breach

#### 1. Misstatements and Failures to Correct

Plaintiff argues that he has, based on the above, adequately pleaded a breach of the fiduciary duty of loyalty for misstatements and failures to correct because some or all of the defendants were responsible for:

- Issuing the April 3, 2017 Form NT 10-K but (i) failing to disclose the equity in lieu of cash change; (ii) failing to disclose that the equity deal was worth far less than $10 million in

1    cash; (iii) continuing to claim the $10 million as "revenue."[2]

- Issuing the April 17, 2017 Form 10-K but failing to: (i) explain why the revenue was $10 million less than expected; (ii) disclose the decision to take equity in lieu of cash from the deal; (iii) disclose that the value of the equity deal was significantly less than $10 million in cash.[3]

- Issuing the April 18, 2017 Form 8-K but (i) failing to correct the misleading impression in the prior statement of the value of the deal and (ii) giving the impression that the Company would still recognize $10 million in value despite the fact the value of the equity was somewhere between just over $212,000 and $3.2 million.[4]

Oppo. at 13-14. Plaintiff argues that the business judgment rule cannot protect the defendants' decision to switch to the much less valuable equity because – based on positions defendants argue in their motion – defendants admittedly failed to adequately inform themselves of the value of the equity before agreeing to take the equity stake in lieu of cash. Oppo. at 15-16.

As to misrepresentations, plaintiff's claims fail because he alleges no facts that the alleged misstatements were made with *knowing falsity*. For example, in the April 3 Form NT 10-K, while the company *repeated* the prior estimated end of 2016 revenue figure of $77.2 million, no mention was made of the Blue California/SweeGen deal. The AC fails to plead facts showing that as of April 3, 2017, the defendants *knew* that the deal would not be recognized as $10 million in revenue for 2016 – either because the accounting decision would recognize revenue in 2017 or because the value of the equity would not compare to the value of the formerly expected $10 million in cash.

As to the April 17 Form 10-K, plaintiff does not dispute that the Form no longer included

---

[2] Plaintiff claims the defendant members of the Audit Committee (Duyk, Reinach, and Williams) were responsible for reviewing and approving this improper statement. Oppo. at 13.

[3] Plaintiff claims defendants Melo, Valiasek, Duyk, Doerr, Piwnica, Reinach, Al Thani, Williams, Yang, Klaeijsen, and Vuillez signed the 10-K and are liable for it. *Id*.

[4] Plaintiff claims the Audit Committee defendants (Duyk, Reinach and Williams) were responsible for reviewing and approving this improper statement. Oppo. at 14.

6

the $10 million as revenue, correctly disclosed the decreased revenue figure, and disclosed no separate value for the equity. Plaintiff's claims regarding this Form are not based on misstatements but instead on a "failure to correct" the misleading impressions regarding the value of the equity addressed below. Similarly, as to the April 18 Form 8-K, defendants explained the reasons why the Company decided to take the SweeGen equity stake in lieu of case but *did not* put a value on the equity taken. Plaintiff does not identify any misrepresentations in those statements; the remaining claims are based solely on failures to correct the impression that the value of the deal was not the $10 million the Company initially disclosed.

Regarding the alleged "failure to correct prior impressions claims" that are the focus of the AC, I explained in the prior Order that a *Malone*-type failure to correct claim is recognized under Delaware law as a violation of fiduciary duty of loyalty and good faith. March Order at 5 (citing *Malone v. Brincat*, 722 A.2d 5, 9 (Del. 1998)).[5] However, in order to state a *Malone*-type claim a heightened scienter standard is required to show the defendants failure to correct was dishonest (in other words, done knowingly and in bad faith).[6] In the April 17, 2018 10-K, defendants correctly noted the reduced revenue figure but did not disclose the equity taken or give any "replacement value" for the equity taken. Similarly, in the April 18, 2017 8-K, the Company disclosed the reason for the reduction in revenue as the decision to take equity, but did not place a value on that equity.

Nonetheless, plaintiff argues that the Form 8-K gave the "clear impression" that the Company would still recognize $10 million in revenue, just in 2017, when it disclosed it was:

> unable to recognize $10 million in fourth quarter and fiscal year 2016 revenue relating to the license agreement with Blue California. This was due to the decision by the Company in the first quarter of 2017 to accelerate its market access and strategic positioning for the sweetener market, which Blue California has interests in, and take an equity stake in one of Blue California's affiliates, focused on the

---

[5] As noted in the March Order, both sides agree that the laws of Delaware apply.

[6] The parties dispute whether "reliance" for a *Malone*-type claim is required for derivative claims. *Compare* Reply at 3-4 *with* Oppo. at 17-19. I need not reach that question as plaintiff has failed to allege facts meeting the heightened scienter standard required, but note that at least one Delaware court has required reliance for derivative claims. *Wilkin on behalf of Orexigen Therapeutics, Inc. v. Narachi*, CV 12412-VCMR, 2018 WL 1100372, at *15 (Del. Ch. Feb. 28, 2018).

7

> sweetener market, in lieu of cash payment under the license agreement. Due to the change in the payment structure, the accounting treatment is different and therefore the revenue recognition has been delayed and is expected in the first half of 2017.

Form 8-K, Item 7.01. Plaintiff contends that this disclosure perpetuated the "impression" that the value of the equity taken would still be $10 million, and points out that defendants failed to disclose any revised revenue valuation from the deal.

That may be true. However, what is lacking from the Amended Complaint are allegations that at the time of this disclosure defendants were being dishonest, that they knew the value of the equity was not $10 million yet allowed the misrepresentation to continue in bad faith. Plaintiff's AC alleges that this impression that $10 million would still be received – and the defendants' decision to allow that misrepresentation to continue – was dishonest because the market value of the equity Amyris received was (using the market price of SweeGen stock from March and April 2017) was under $300,000. AC ¶ 60. These allegations, however, do not meet the heightened standard to plausibly suggest that defendant *intentionally* failed to correct (or were otherwise required to disclose) their current belief as to the value of the equity from the deal.

The heart of plaintiff's new theory, it seems, is that defendants' decision to allow the perception that Amyris would still receive $10 million in revenue from the deal to continue was a breach of their fiduciary duty because defendants failed to inform themselves as to the actual value of the equity. As support for the failure to inform theory, plaintiff looks to the actual number of shares received by Amyris (transferred to Amyris on April 17, 2018, as disclosed in the Company's 10-Q filed on May 16, 2017) and using SweeGen's share prices from March and April 2017, estimate the value as being under $300,000. AC ¶ 60. Plaintiff also points out that the actual revenue recognized from the equity through June 30, 2017 was only $2.7 million and that an independent valuation of the equity was only $3.2 million. *Id*. ¶¶ 60, 61.

But to state a breach of the duty of care, which is what this claim sounds in, plaintiff must plead facts showing "gross negligence" (meaning "conduct that constitutes reckless indifference or actions that are without the bounds of reason"), the "intentional dereliction of duty or the conscious disregard for one's responsibilities," or subjective bad intent. *McPadden v. Sidhu*, 964

A.2d 1262, 1274 (Del. Ch. 2008) (relying on *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 66 (Del.2006)). No such facts have been alleged here.[7]

To the extent that defendants agreed to a "bad deal" when they forwent cash for equity, that decision is protected by the business judgment rule. The business judgment rule creates "a powerful presumption in favor of actions taken by the directors in that a decision made by a loyal and informed board will not be overturned by the courts unless it cannot be 'attributed to any rational business purpose.'" *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993), as modified, 636 A.2d 956 (Del. 1994). In the absence of facts showing that defendants breached their duties of good faith, loyalty, or due care – which as noted above have not been adequately alleged – the decision to take equity in lieu of cash is protected from second guessing by this Court.

## II. DEMAND FUTILITY

Defendants again move to dismiss because plaintiff failed to file a pre-suit demand for legal action, as required under Federal Rule of Civil Procedure 23.1(b), or to allege facts showing that a pre-suit demand would have been futile. "The purpose of this demand requirement in a derivative suit is to implement the basic principle of corporate governance that the decisions of a corporation—including the decision to initiate litigation—should be made by the board of directors or the majority of shareholders." *Rosenbloom v. Pyott*, 765 F.3d 1137, 1148 (9th Cir. 2014) (internal quotations omitted).

Demand is excused as futile where particularized facts are alleged showing doubt that: "(1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984); *see also In re Silicon Graphics Inc. Securities Litigation* (9th Cir. 1999) 183 F.3d 970, 990 (9th Cir. 1999), overruled on other grounds. Plaintiff asserts that he has satisfied this test by alleging facts showing that at least half of the directors would face a substantial risk of liability if

---

[7] As noted in the March Order, and not addressed by plaintiff on this round of briefing, there are no facts that any defendant was acting in self-interest and breached the duty of loyalty.

9

the litigation were pursued. Oppo. at 11. However, as identified above, no facts have been alleged that could support liability for any of the defendants, nor have facts been alleged to take the actions of defendants outside the protection of the business judgment rule. Plaintiff has not adequately alleged futility of pre-suit demand.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is GRANTED. As plaintiff has not been able to adequately allege his claims, despite multiple attempts and shifting theories of liability, DISMISSAL is WITH PREJUDICE.

**IT IS SO ORDERED.**

Dated: July 23, 2018

William H. Orrick
United States District Judge